## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOSEPH BIASI, individually and on behalf of all others similarly situated, | : : : | |
| Plaintiff, | : : : | Civil Action No.: 6:15-cv-00454-GTS-ATB |
| v. | : : : | |
| WAL-MART STORES EAST, LP., EARLENE SCHAEFFER, RYAN DUNPHY, and REBECCA PAUKSTELA | : : : | |
| Defendants. | : : : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT WAL-MART STORES EAST, LP'S MOTION FOR
## SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND CAUSE OF ACTION

McCARTER & ENGLISH, LLP
City Place I
185 Asylum Street
Hartford, CT 06103
Pamela J. Moore
Sami Asaad
*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................. i

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ....................................................................................2

    The Amsterdam Walmart Store .......................................................................2

    Plaintiff's Duties ..............................................................................................3

    Walmart's Dress Code .....................................................................................5

ARGUMENT 7

POINT I        SUMMARY JUDGMENT IS APPROPRIATE WHERE NO
              GENUINE ISSUES OF MATERIAL FACT EXIST WARRANTING
              A TRIAL. ................................................................................................7

POINT II      SUMMARY JUDGMENT SHOULD BE GRANTED ON THE
              SECOND CAUSE OF ACTION BECAUSE THE AMSTERDAM
              WALMART STORE DOES NOT INCLUDE ANY "RESTAURANT
              OPERATIONS" ...................................................................................8

POINT III    EVEN IF THE DELI DEPARTMENT WERE DEEMED TO
              CONTAIN A "RESTAURANT OPERATION," WALMART IS
              ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF
              ADMITTED HE HAD NO INVOLVEMENT IN SUCH
              OPERATION ......................................................................................15

POINT IV   SUMMARY JUDGMENT IS APPROPRIATE BECAUSE
              PLAINTIFF'S TESTIMONY ESTABLISHES THAT THE "WASH
              AND WEAR" EXCEPTION WAS SATISFIED ...............................17

POINT V    PLAINTIFF'S PROPOSED AMENDED COMPLAINT DOES NOT
              SAVE THE SECOND CAUSE OF ACTION FROM SUMMARY
              JUDGMENT .......................................................................................19

CONCLUSION...................................................................................................21

ME1 23035576v.3

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................................7

*Barenboim v. Starbucks Corp.*,
   698 F.3d 104 (2d Cir. 2012)....................................................................................13

*Beasley v. Alabama State University*,
   3 F.Supp.2d 1325 (M.D. Ala. 1998) .......................................................................14

*Carvente-Avila v. Chaya Mushkah Rest. Corp.*,
   No. 12-CV-5359, 2016 U.S. Dist. LEXIS 75396 (S.D.N.Y. Mar. 1, 2016) ...........13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................7, 8

*Colaio v. Feinberg*,
   262 F.Supp.2d 273 (S.D.N.Y. 2003).......................................................................14

*Gregory v. Stewart's Shops Corp.*,
   No. 7:14-cv-33(TJM/ATB), 2016 U.S. Dist. LEXIS 89576 (July 8, 2016, N.D.N.Y.)...........19

*Henzel v. Delaware Osego Corp.*,
   285 F. Supp. 271 (N.D.N.Y. 2003) (Sharpe, J.).......................................................8

*Holtz v. Rockefeller & Co.*,
   258 F.3d 62 (2d Cir. 2001).........................................................................................7

*Joseph v. Burlington*,
   136 S. Ct. 480 (2015)..................................................................................................9

*Matsushita Electrical Industries Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................................7

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)..................................................................................................14

*St. Pierre v. Dyer*,
   208 F.3d 392 (2d Cir. 2000)........................................................................................8

*U.S. v. Peterson*,
   394 F.3d 98 (2d Cir. 2005)........................................................................................18

**STATE CASES**

*In re Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A*,
  117 A.3d 457 .................................................................................................................9

*Krol v. CF&I Steel*, 307 P.3d 1116, 1119 (Colo. Ct. App. 2013)..................................9

*Samiento v. World Yacht Inc.*,
  10 N.Y.3d 70 ..............................................................................................................13

**RULES**

Fed. R. Civ. P. 20(a)(2) ...................................................................................................20

Fed. R. Civ. P. 56(c) .........................................................................................................7

Rule 20 .............................................................................................................................20

Rule 56 ...............................................................................................................................8

**REGULATIONS**

12 NYCRR 146-3.2 ...................................................................................................15, 17

12 NYCRR pt. 137...............................................................................................................8

12 NYCRR pt. 138...............................................................................................................8

12 NYCRR pt. 142.......................................................................................10, 11, 12, 13, 14

12 NYCRR pt. 146 ("HIWO")..........................1, 8, 9, 10, 13, 14, 15, 17, 18, 19, 20

**12 NYCRR § 137-3.1** ......................................................................................................9

12 NYCRR § 142-1.1 ......................................................................................................10

12 NYCRR § 146-1.1(a) .....................................................................................................8

12 NYCRR § 146-1.7(b)...................................................................2, 3, 4, 5, 6, 18

**12 NYCRR § 146-3.1** ......................................................................................................9

ii

## PRELIMINARY STATEMENT

The Second Cause of Action in Plaintiff's Second Amended Complaint ("SAC"), asserts a claim for uniform maintenance pay under New York's Hospitality Industry Wage Order, 12 NYCRR Part 146 ("HIWO").  The HIWO applies only to workers in restaurants and hotels.  Plaintiff seeks to assert a claim under the HIWO on behalf of "***all*** persons who work or have worked as a non-exempt employee for defendant Wal-Mart in one of its retail stores located in the State of New York in the past six years." SAC,  Dkt. No. 28, ¶ 61 (emphasis added).

Plaintiff's deposition testimony demonstrates that neither he nor anyone else in the class he seeks to represent has an actionable claim under the HIWO because neither he nor the putative class members work in restaurants and hotels as defined by applicable law and administrative guidance.  In particular, as explained in detail below, interpretive guidance issued by the New York State Department of Labor ("NYSDOL") makes clear that food sales of the type at issue here do not satisfy the definition of a "restaurant" and do not fall within the HIWO.

Moreover, even assuming *arguendo* that some members of Walmart's workforce (i.e., deli workers) are deemed to be restaurant workers subject to the HIWO, Plaintiff admitted at his deposition that he had absolutely no involvement with the deli department.  Rather the full extent of Plaintiff's involvement in the deli was described by him as follows:  [I] waved "'hello,' walked by, and that was all." Transcript of the Deposition of Joseph Biasi ("Biasi Dep."), 210:1-7.  In the face of this sworn testimony alone, he cannot assert a claim under the HIWO for either himself or others.

Finally, even if the HIWO applied to Plaintiff (or anyone else employed at the Amsterdam store), Plaintiff's deposition testimony indisputably evidences that the HIWO's wash and wear exception applies and was satisfied given the nature of the uniform in issue.  Under the "wash and wear" exception, an employer covered by the HIWO does not have to make payments

for uniform maintenance if the uniforms at issue are made of wash and wear materials, may be routinely washed and dried with other clothes, do not require special care, and are furnished "in sufficient number … consistent with the average number of days per week worked by the employee." 12 NYCRR § 146-1.7(b).  As set forth more fully below, there is no genuine dispute that these criteria have been satisfied here.

As a result, even if Plaintiff were able to add another employee who was actually employed by the deli department, his testimony, making clear that the vest in issue is absolutely a wash and wear item, would make the addition of any other employee a futility.

For these reasons, summary judgment should be entered in favor of Walmart with regard to the Second Cause of Action in the SAC.

## STATEMENT OF FACTS

### The Amsterdam Walmart Store

The Amsterdam Walmart store is one of Walmart's "Supercenters," meaning it has a wide variety of departments, including both general merchandise and groceries.  *See* Declaration of Ryan Dunphy ("Dunphy Dec."), ¶ 2.  The store also includes a deli department that sells a wide variety of packaged items on a retail basis as well as some prepared foods.  *Id.* at ¶ 3.

The prepared food sold by deli department associates is sold exclusively on a retail, take-out basis.  *Id.* at ¶ 4.  There is no table service, counter service, or curb service of any kind, and there are no tables or counters at which customers can sit and eat a meal.  *Id.* at ¶ 6.  There is neither a soda fountain nor brewed coffee or tea available.  *Id.* at ¶¶ 7-8.  The deli department does not even take payment from customers.  *Id.* at ¶ 9.  Instead, customers must take all prepared food (and any other deli items) to the check-out lanes like all other store merchandise.  *Id.*  Walmart does not provide services of any kind ancillary or incidental to the sale of the take-out food items.  *Id.* at ¶ 10.  Walmart associates (employees) do not deliver any food to

2

customers, whether on a catering/banquet or box lunch basis.  *Id.* at ¶ 12.  They do not serve customers at a table or clean up after them.  *Id.* at ¶ 11.

### Plaintiff's Duties

Plaintiff worked in the Amsterdam Walmart as an "Unloader."  Biasi Dep. at 39:25-40:7.[1] As an Unloader, Plaintiff spent "a good majority" of his time in the receiving area.  *Id.* at 99:9-12.  Plaintiff testified that he spent most of his time unloading "general merchandise" (or "GM") trucks.  *Id.* at 100:15-17.   Plaintiff described general merchandise as:

> [a]nything that's, like, stock pallets, mixed in: Water, bicycles, electronic products.  Anything that's stocked throughout the store on a shelf would be considered general merchandise that wasn't frozen, dairy, or food.  Regular merchandise we stocked on the shelf.  That's what came on the GM truck.

*Id.* at 100:20-101:2.

Another daily task Plaintiff had to perform was sorting merchandise that arrived mixed together into cardboard boxes called "break packs."  *Id.* at 203:2-14.  Break packs were sorted in the "One Touch Area."  *Id.*  at 202:15-18, 204:21-205:11.  Plaintiff testified that he spent "an hour and a half" to "three hours" every day working on break packs.  *Id.* at 205:15-21.

Additionally, Plaintiff was routinely tasked with processing apparel.  *Id.* at 96:14-97:21; 98:7-17.  Plaintiff testified that processing apparel involved the following procedures:

> We had to take it out of the plastic. It was – some of it was on hangers.  Some of it we had to put on hangers ourself, whatever. We had to put on the hangers on the respective rack for which they wanted.  Like, the infants', boys', and girls' went on one.  Men's was on one side.  Women's was on another, and there was a blue rack for regular apparel, and there was a red rack for what Wal-Mart called star freight where -- if it was like, say, a special season,

---

[1] Excerpts of Plaintiff Joseph Biasi's deposition transcript are attached to the Declaration of Sami Asaad ("Asaad Dec.) as Exhibit A.

> occasion, a holiday, and it was certain clothing set aside to sell
> from for different things.

*Id.* 207:8-208:6.

Plaintiff also was responsible for "binning," which refers to stocking "overstock" merchandise in the warehouse area. *Id.* at 206:10-25.

Occasionally, Plaintiff also unloaded other trucks such as the "remix" trucks, and meat and produce trucks. *Id.* at 107:14-17, 182:25-183:2, 183:21-184:5.

According to Plaintiff, there was one truck that came into the store called the "frozen, dairy, deli" ("FDD") truck that contained some items to be stocked in the deli department. This truck included things like "frozen foods" "bakery stuff," "dairy products, like milk, juice, yogurt, cheeses, cottage cheese," and "Deli [products] … like, steaks, sausage, hot dogs, [and] meats." *Id.* at 101:9-17. According to Plaintiff, the FDD truck was the only truck he knew of that brought food products sold by the deli department.[2] *Id.* at 101:3-102:5. Items on the FDD truck were "all mixed together" on pallets, and the truck contained between 3-10 pallets. *Id.* at 101:9-25, 115:20-116:6.

When the FDD truck arrived, one of the Unloaders would quickly unload the pallets using a pallet jack, and return to their prior duties. *Id.* at 117:22-118:1. The pallets were placed into a central cooler/freezer outside of the deli department. *Id.* at 112:17-25. Significantly, the deli department had its own cooler/freezer that Plaintiff never entered. *Id.* at 112:17-25, 114:4-8. Plaintiff estimated that it took from a "couple of minutes" to "10 to 15 minutes" to unload the FDD truck. *Id.* at 116:7-20, 117:17-19. He also testified that unloading the FDD truck was not an everyday task for him. *Id.* at 108:9-17.

---

[2] It should be noted here that the facts as described by Plaintiff are being taken as true for purposes of this motion. While Walmart disagrees with certain statements he made (including this one), any dispute is immaterial to the outcome of the motion. In the event summary judgment is not granted, however, Walmart reserves the right to provide evidence contrary to Plaintiff's deposition testimony with regard to all issues.

4

Once the pallets were unloaded and placed in the central cooler/freezer, Deli Department Associates—not Unloaders like Plaintiff-- would retrieve merchandise for the deli department from the central cooler/freezer and bring it to stock in the deli department.  Dunphy Dec. at ¶ 15.

As an Unloader, Plaintiff occasionally was tasked with stocking merchandise on the sales floor.  This entailed stocking "general merchandise," including grocery items, in various departments outside the deli.  Biasi Dep. at 104:8-105:11.  The closest Plaintiff ever got to the deli was stocking the sales floor "outside" the deli "where customers can pick from and buy from."  *Id.* at 113:23-114: 12.  The items he stocked were packaged items like packaged hot dogs and hams.  *Id.* at 113:23-114:3, 114:15-18.  Neither these items nor any of the general merchandise or grocery items were used to make the prepared foods sold by the deli department. Dunphy Dec. at ¶ 5.

Plaintiff never worked as a deli associate.  Biasi Dep. at 182:22-24.  He did not "even know anyone who worked in the deli."  *Id.* at 210:1-4.  Plaintiff's interaction with the deli was limited to saying "'hello,' walk[ing] by, and that was all." *Id.* at 210:1-7.

**Walmart's Dress Code**

Prior to September 2014, Walmart's dress code required Unloaders to wear a clean blue shirt and either jeans or khakis.  *Id.* at 11:24-12:15.  Plaintiff testified that he "wore a different clean pair [of pants] every single day," and "wore a different [shirt] every day that was clean." *Id.* at 21:18-22:1.  Plaintiff testified that he would "bring [his clothes] home, wash them, and when they're clean, wear them back to work again."  *Id.* at 21:10-15.

Beginning on September 29, 2014, Walmart added a vest to the dress code.  Declaration of Stephanie Currao ("Currao Dec."), ¶ 2. On September 27, 2014, Walmart published an updated dress code policy for New York associates on the WIRE.  *Id.* at ¶ 3.  The WIRE is a computerized repository of all of Walmart's policies that are applicable to associates and to

5

which associates have open access.  *Id.* at ¶ 4.  The new dress code policy also was posted "on the wall outside personnel."  Biasi Dep. at 172:6-16.  Plaintiff remembers seeing portions of the policy "[p]robably more than once."  *Id.* at 172:6-16, 174:16-23.

The new dress code policy (applicable to New York employees) noted that uniform items that were capable of been washed and worn (like the vest), would be laundered for associates "at the company's expense."  *Id.* at 173:9-15, Ex. 10 at WAL-000451.[3]  In fact, Plaintiff testified that both his wife and father, who are employed at the Amsterdam Walmart, leave their vests at the store and are furnished with a fresh vest for their next shift.  Biasi Dep. at 90:23-91:5; 92:17-21.

Plaintiff was initially issued two vests to cover his five shifts at Walmart's expense.  *Id.* at 171:16-17, Ex. 9 at WAL-000419.[4]  Plaintiff testified, however, that if he ever needed to obtain another vest, he simply asked, and one was provided.  Biasi Dep. at 91:25-92:5; *see* Dunphy Dec. at ¶ 13.  The Amsterdam Walmart has a room full of vests in all different sizes. Dunphy Dec. at ¶ 14.

Plaintiff understood that the vests were machine washable and testified that he would throw his vests into the wash with the rest of his laundry "maybe every couple of days."  Biasi Dep. at 91:18-24; 92:10-13, 175:23-176:1.  Plaintiff never complained about having to wash his vest because, as he testified, he "never had a reason to."  *Id.* at 175:17-20.

---

[3] A copy of Exhibit 10 to the Deposition of Joseph Biasi is attached as Exhibit B of the Asaad Dec.
[4] A copy of Exhibit 9 to the Deposition of Joseph Biasi is attached as Exhibit C of the Asaad Dec.

ME1 23035576v.3

## ARGUMENT

## POINT I

## SUMMARY JUDGMENT IS APPROPRIATE WHERE NO GENUINE ISSUES OF MATERIAL FACT EXIST WARRANTING A TRIAL.

Summary judgment may be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of fact exists when a "reasonable jury could return a verdict for the nonmoving party," and "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a way to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted unless the nonmoving party comes forward with affirmative evidence that clearly demonstrates there exists a genuine issue of material fact to be tried. *Anderson*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient, there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. To defeat a summary judgment motion, however, the nonmoving party must do "more than simply show that there is metaphysical doubt as to the material facts." *Matsushita Electrical Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In opposing a properly supported motion for summary judgment, a plaintiff "may not rely on conclusory allegations or unsubstantiated speculation" or "the mere allegations or denials of [his] pleadings, but the adverse party's response, by affidavits or as otherwise provided by in

7

Rule 56, must set forth specific facts showing that there is a genuine issue for trial." *Henzel v. Delaware Osego Corp.*, 285 F. Supp. 271, 275 (N.D.N.Y. 2003) (Sharpe, J.) (quoting *St. Pierre v. Dyer*, 208 F.3d 392, 404 (2d Cir. 2000).

Accordingly, summary judgment must be granted "against a [plaintiff] who fails to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case, and on which that [plaintiff] will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Such a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## POINT II

### SUMMARY JUDGMENT SHOULD BE GRANTED ON THE SECOND CAUSE OF ACTION BECAUSE THE AMSTERDAM WALMART STORE DOES NOT INCLUDE ANY "RESTAURANT OPERATIONS"

To be actionable, Plaintiff's Second Cause of Action requires that the Court find that the HIWO applies to Plaintiff as well as to all others in the class he seeks to represent. To reach this conclusion, the Court would also have to find that a) the deli department in the Amsterdam store is a restaurant as defined in the HIWO; and b) that Plaintiff worked in the deli department. For the reasons set forth below, neither of these findings is supported by the facts or applicable law.

The HIWO defines the obligations that employers in the hospitality industry have with respect to each employee in the hospitality industry. 12 NYCRR § 146-1.1(a). The HIWO was issued in 2011 and combined an existing separate Wage Order for the Restaurant Industry, 12 NYCRR Part 137, and the Wage Order for the Hotel Industry, 12 NYCRR Part 138. Accordingly, the definition of "restaurant," in the HIWO is virtually identical to the definition found in the older Wage Order for the Restaurant Industry:

| Hospitality Industry Wage Order, 12 NYCRR § 146-3.1 (emphasis added) | Wage Order for the Restaurant Industry, 12 NYCRR § 137-3.1 (emphasis added) |
| --- | --- |
| (b) The term restaurant includes any eating or drinking place that prepares and offers food or beverage for human consumption either on any of its premises or by such  service as catering, banquet, box lunch, curb service or counter service to the public, to employees, or to members or guests of members, **and** services in connection therewith or incidental thereto.   The term restaurant includes but is not limited to restaurant operations of other types of establishments, restaurant concessions in any establishment and concessions in restaurants. | The term "restaurant industry" includes any eating or drinking place that prepares and offers food or beverage for human consumption either on any of its premises or by such service as catering, banquet, box lunch or curb or counter service, to the   public, to employees or to members or guests of members, **and** services in connection therewith or incidental thereto.

The industry includes but is not limited to restaurant operations of other types of establishments, restaurant concessions in any establishment and concessions in restaurants. |

As a preliminary matter, on the face of the applicable definition, Plaintiff's claim fails because Walmart certainly did not provide any "services in connection" with the offer of food or beverages for human consumption.  It is undisputed that food was sold for take-out only by the deli department in the Amsterdam store.  There were no tables, no counters, no waiters or waitress, busboys or the like.  Given that the word "and" is used in the definition, it is conjunctive and both requirements must be present for it to be satisfied.  *See In re Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A*, 117 A.3d 457, 462 (Vt. 2015), *cert. den'd*, *Joseph v. Burlington*, 136 S. Ct. 480 (2015) (holding that a "rule's use of the word 'and' indicates an intent for the phrases to be conjunctive"); *Krol v. CF&I Steel*, 307 P.3d 1116, 1119 (Colo. Ct. App. 2013) ("where a statute connects requirements by means of 'and,' both requirements must be met for the operative provision to apply") (citing  1A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 21:14, at 177-79, 184, 189 (7th ed. 2009)). That is indisputably not the case here—the second requirement is simply not present.

In addition to the actual wording of the definition, the New York State Department of Labor has provided significant guidance on the applicability of the HIWO versus the

9

Miscellaneous Wage Order to various operations that sell food for human consumption.  Indeed, NYSDOL's 2014 Labor Standards' Field Investigator's Manual (the "Investigator's Manual")[5] provides clear administrative guidelines issued by the "Division … to interpret the various Wage Orders."  Investigator's Manual at 32.  A review of the Investigator's Manual reveals that the HIWO does **not** apply to a prepared food section in a larger retail store and certainly would not apply to Plaintiff even if it did.

The Investigator's Manual provides the following guidance in determining whether to apply the Restaurant or the Miscellaneous Wage Order:[6]

> There are a number of situations where the Investigator may not be sure whether a food establishment is to be covered by the Restaurant or by the Miscellaneous Wage Order.  A food establishment is to be covered under the Restaurant Wage Order if it prepares and offers food to customers for immediate consumption on its premises or in the immediate vicinity; or if it prepares and delivers individual meals or portions of ready-to-eat food by box lunch or catering service.  ***A food establishment that does not meet either of these requirements is to be covered under the Miscellaneous Wage Order.***

Investigator's Manual at 380 (emphasis added).  According to this guidance, not all "food establishments" qualify as "restaurants." A "food establishment" must meet one of two requirements to constitute a "restaurant." The "food establishment" must either prepare and offer food "for immediate consumption" or deliver individual meals or portions of ready-to-eat food.

That the mere preparation and sale of food does not constitute a "restaurant" is emphasized by the Investigator's Manual's finding that several food establishments are not "restaurants" even though they exist ***solely*** to prepare and sell food. For example, according to

---

[5] Relevant excerpts of the Investigator's Manual is attached as Exhibit D to the Asaad Dec.
[6] The Wage Order for Miscellaneous Industries and Occupations, 12 NYCRR Part 142, ("Miscellaneous Order") applies to "all employees … except (a) employees who are covered by minimum wage standards in any other minimum wage order." 12 NYCRR § 142-1.1.

the Investigator's Manual, a Chinese food establishment that sells food on a purely takeout basis

is *not* a restaurant:

> **<u>Chinese Takeout</u>** – this type of establishment ordinarily does not provide facilities for consumption on the premises and offers no delivery service. ***The Miscellaneous order will therefore be applied.*** However, if a particular establishment, in addition to preparing food, provides a bar or stand for consumption of food on the premises, or if it delivers orders, the restaurant order is applicable.

Investigator's Manual at 380.  Similarly, the Investigator's Manual states that a fried chicken

establishment that does not provide facilities for the consumption of its food will fall under the

Miscellaneous Order.  *Id*. at 381.  Even a pizza establishment that sells—and delivers—whole

pizza pies is not a restaurant:

> **<u>Pizza Establishments</u>** – Pizza stands that provide facilities for on-premises consumption of individual slices of pizza and beverages are to be covered under the restaurant order. ***However, pizza establishments that sell or sell and deliver whole pizza pies, and which maintain no table or other facilities for consumption on the premises are covered under the miscellaneous order.*** If, however, such pizza establishments not only sell whole pizza pies but also provide a table on the premises for pizza consumption by a group of customers, the restaurant order will apply.

*Id.* at 382 (emphasis added).

With regard to deli operations in particular, the Investigator's Manual specifically notes

that there are two distinct types of delis, which it refers to as the "German Style Delicatessen"

and the "Jewish Style Delicatessen." The Investigator's Manual describes the German Style

Delicatessen as a "type of establishment [that] is essentially retail" to which the Miscellaneous

order applies.  *Id.*  Even if "the establishment makes ***and delivers*** sandwiches," only the

employee "who is engaged in delivery work" would be classified as a restaurant employee. *Id.*

(emphasis added).   "The restaurant order would be applied to this employee only; the

miscellaneous order is applicable to the other delicatessen employees."  *Id.* By contrast, most

Jewish Style Delicatessens "provide facilities for on-premises food consumption" or "engage in catering either in the home or a place of business" and are, therefore, considered restaurants as defined in the wage orders. *Id.* at 381. Thus, whether the deli department in the Amsterdam Walmart qualifies as a "restaurant" depends on whether it follows the model of a German Style Deli or a Jewish Style Deli, and the undisputed material facts firmly support the former.

In fact, even the factual allegations in the SAC about the nature of the deli department, (all of which are made "upon information and belief") support this finding:"

> 52. Upon information and belief, Wal-Mart "prepares and offers food or beverages for human consumption."
>
> 53. Upon information and belief, Wal-Mart engages in catering services, "for every occasion", where it provides, among other things, sandwich trays, sliders trays (mini hamburgers), sub sandwiches of two (2), four (4) and six (6) feet, shrimp cocktail trays and hot food trays.
>
> 54. Upon information and belief, Wal-Mart will provide an associate to help pick the menu for your event or to fulfill any custom orders/requests.
>
> 55. Upon information and belief, Wal-Mart also provides a counter service where customers can pick from multitudes of hot and cold food items, including but not limited to, rotisserie chicken, fried chicken, chicken wings, macaroni and cheese, mashed potatoes, coleslaw, potato salads and macaroni salads. Wal-Mart will then package and weigh them out in ready to eat "to-go" containers.

SAC, ¶¶ 52-55. Conspicuously absent from Plaintiff's SAC is any allegation that the deli department provides "facilities for on-premises food consumption;" that it delivers any food; or that it provides services such as table service, counter service, wait service or busboys. *See* Investigator's Manual at 381. Indeed, there can be no such allegation because the deli department of the Amsterdam Walmart does none of these things. The deli does not provide tables, seats, a bar, or a counter for immediate consumption of food. *See* Dunphy Dec. at ¶ 6.

12

Moreover, none of the deli associates (or any other associate) delivers individual meals (or any food whatsoever) to a customer's home or place of business. *Id.* at ¶ 12.

Although Plaintiff alleges that the deli "engages in catering services" by providing "sandwich trays" and other platters (SAC ¶ 53), the preparation of platters solely for customer pick up does not constitute "catering" under the HIWO. According to the Investigator's Manual, the term "catering," as used in the HIWO, consists of delivering food to a "home or place of business." Investigator's Manual at 381 ("A food establishment is to be covered under the Restaurant Wage Order … if it prepares **and delivers** individual meals or portions of ready-to-eat food by box lunch or catering service." (Emphasis added)). The undisputed evidence is that none of the deli associates (or any other associates) delivered any food to customers' homes or businesses. *See* Dunphy Dec. at ¶ 12.

In short, the deli department at the Amsterdam Walmart bears no resemblance to a Jewish Style Deli. Instead, the deli department primarily sells packaged food items such as packaged "hot dogs, meats, [and] hams." Biasi Dep. at 113:18-114:3. The prepared food items sold at the deli department are sold exclusively on a retail, take-out basis. Dunphy Dec. at ¶ 4. Consequently, the deli department at the Amsterdam Walmart falls under the Investigator's Manual's definition of a German Style Deli and, according the Investigator's Manual, is subject to the Miscellaneous Wage Order.

This is significant because the guidance and interpretations contained in the Investigator's Manual are entitled to deference provided that they are not "inconsistent with [the] entire regulatory and statutory scheme." *Carvente-Avila v. Chaya Mushkah Rest. Corp.*, No. 12-CV-5359, 2016 U.S. Dist. LEXIS 75396 at *5 (S.D.N.Y. Mar. 1, 2016). *See also Barenboim v. Starbucks Corp.,* 698 F.3d 104, (2d Cir. 2012) *citing Samiento v. World Yacht Inc.*, 10 N.Y.3d

70, 79 ("'Labor Department's interpretation of a statute it is charged with enforcing is entitled to deference' pursuant to general administrative law principle that 'construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld.'")  The Investigator's Manual "while not controlling upon the courts by reason of [its] authority, do[es] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  *See also Colaio v. Feinberg,* 262 F.Supp.2d 273, 289   (S.D.N.Y. 2003) (affording deference to the interpretive policies of a special master appointed to administer the September 11th Victim Compensation Fund of 2001); *Beasley v. Alabama State University*, 3 F.Supp.2d 1325, 1335 (M.D. Ala. 1998) (giving deference to investigator's manual in the absence of judicial interpretation).

In the absence of a judicial interpretation, the Investigator's Manual serves as an invaluable source of law to determine the appropriate New York Wage Order to apply to Walmart.  That guidance leads to the inevitable conclusion that neither Walmart nor its deli department is a restaurant bound by the HIWO.  Where, as here, an establishment sells food items purely on a take-out basis and provides no facilities for the consumption of food, the NYSDOL directs its investigators to apply the Miscellaneous Order.  This Court should do the same.

ME1 23035576v.3

## POINT III

**EVEN IF THE DELI DEPARTMENT WERE DEEMED TO CONTAIN A "RESTAURANT OPERATION," WALMART IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF ADMITTED HE HAD NO INVOLVEMENT IN SUCH OPERATION**

The HIWO defines "employee" as "any individual suffered or permitted to work in the hospitality industry." 12 NYCRR 146-3.2. In the Decision and Order on Wal-Mart's Motion to Dismiss, the Court held that "[t]he Court cannot find that the Hospitality Industry Wage Order is intended to include employees that work strictly within a department of a store that has no relation to its food service operations." Dkt. No. 30 at 11. Thus, if the deli department were deemed to contain a restaurant operation, whether Plaintiff is covered by the HIWO would depend on whether he worked in such operation. As his own deposition testimony demonstrates, Plaintiff had extremely limited, if any, interaction with the deli department in general and absolutely no involvement with its prepared-food operation.

Plaintiff testified that he was never employed as a Deli Associate. Biasi Dep. at 182:22-24. The only position Plaintiff held during the relevant time period was the Unloader position. *Id.* at 39:25-40:13. As an Unloader, Plaintiff spent a "good majority" of his time in the receiving area, and spent most of his time unloading the general merchandise trucks. *Id.* at 99:9-12, 100:15-17. The remainder of his time was spent sorting general merchandise that arrived in "break packs," processing apparel, stocking general merchandise, including dry grocery items, and binning overstock in the receiving area. *Id.* at 96:14-97:21; 98:7-17, 202:15-18, 203:2-14, 204:21-205:11, 205:15-21, 206:10-25, 207:8-208:6.

Occasionally, Plaintiff also unloaded the FDD truck, "remix" truck, and the meat and produce truck. 107:14-17, 182:25-183:2, 183:21-184:5.

15

With regard to the food products that were used in the deli department's prepared-food operation, Plaintiff testified that these arrived on the FDD truck along with other packaged items such as dairy products, packaged frozen foods, and packaged deli meats.  *Id.* at 101:9-102:2. All of the frozen, dairy, and deli items (both the packaged-for-retail products and the products used as prepared foods) arrived mixed together on three to ten pallets and were stored in a central cooler/freezer. *Id.* at 101:25, 115:20-116:6, *Id.* at 112:17-25.  On the days that Plaintiff happened to unload the FDD truck (which he admits was not routine), his tasks consisted of pulling the pallets off of the truck with a pallet jack and placing them in the centralized cooler/freezer in the warehouse area.  He did ***not***, as was suggested in opposition to Walmart's Motion to Dismiss, "deliver" any of these items the deli department.[7]  *See* Dkt. No. 25, Pg. 3 of 10.  This took Plaintiff no more than approximately 10 to 15 minutes, and did not involve working in the deli. *Id.* at 116:7-20, 117:17-19.

Rather, the deli department had its own cooler, and Plaintiff never stocked goods in that cooler. *Id.* at 112:17-25, 114:4-12.  This was done by the deli department associates.  *See* Dunphy Dec. at ¶ 15.  The closest Plaintiff ever got to the deli was stocking the sales floor "outside" the deli "where customers can pick from and buy from." Biasi Dep. at 113:23-114: 12. The items he stocked were packaged items like packaged "hot dogs and hams" *Id.* at 113:23-114:3, 114:15-18.  Neither these items nor any of the general merchandise or grocery items were used to make the prepared foods sold by the deli department.  Dunphy Dec. at ¶ 5.

---

[7] The Court (in the context of a 12(b)(6) motion) found that the allegation that Plaintiff "assisted with 'unloading grocery items'" was "sufficient—albeit barely—to plausibly suggest" that Plaintiff was involved as a "non-service worker" in a restaurant operation.  *See* Dkt. No. 30 at 11.  Plaintiff's deposition testimony, however, dispels the potential conclusion that he was a "non-service worker" in the deli and establishes, instead, that he did not deliver grocery items to the deli department sufficient to even plausibly state a claim.  Moreover, the deli department did not use the store's grocery items in the prepared foods. *See* Dunphy Dec. at ¶ 5.

16

In short, the Plaintiff was not part of the deli's prepared-food operation, and there is no evidence to support Plaintiff's contention that his role was "integral" to the deli's prepared-food operation.  Indeed, Plaintiff summarized it best when he testified that is involvement with the deli was limited to saying "'hello,' walk[ing] by, and that was all."  Plaintiff was simply not an "individual suffered or permitted to work in the hospitality industry." 12 NYCRR 146-3.2.

## POINT IV

### SUMMARY JUDGMENT IS APPROPRIATE BECAUSE PLAINTIFF'S TESTIMONY ESTABLISHES THAT THE "WASH AND WEAR" EXCEPTION WAS SATISFIED

Assuming, *arguendo*, that Plaintiff was a hospitality industry employee covered by the HIWO, neither Plaintiff nor anyone else is owed uniform maintenance pay because the HIWO's "wash and wear" exception indisputably applies to the Walmart vest.  The "wash and wear" exception applies to uniforms "that an employee can easily wash with regular clothes, and can wear to work without dry cleaning, ironing, etc." *See* N.Y. State Dep't of Labor, Guidance for the New York State Hospitality Industry on Uniforms (2013).[8]

Under the "wash and wear" exception:

An employer will not be required to pay the uniform maintenance pay, where required uniforms

(1) are made of "wash and wear" materials;

(2) may be routinely washed and dried with other personal garments;

(3) do not require ironing, dry cleaning, daily washing, commercial laundering, or other special treatment; and

(4) are furnished to the employee in sufficient number, or the employee is reimbursed by the employer for the purchase of a

---

[8] A copy of this document is attached as Exhibit E to the Asaad Dec.

> sufficient number of uniforms, consistent with the average number of days per week worked by the employee.

12 NYCRR § 146-1.7(b).

Applying the four factors in the wash and wear exception to this case, it is readily apparent that the uniforms at issue in this case, which consist solely of blue vests worn over the employee's ordinary wardrobe, fit squarely into the exception.   At his deposition, Plaintiff testified that his vest was washable.  Biasi Dep. at 91:18-24.   He further testified that he washed and dried the vests at home, along with his other clothing, in his own washing machine and dryer.  *Id.* at 91:8-15.  Plaintiff also testified that he washed his vest every few days.  *Id.* at 91:18-24; 92:10-16.   Thus, Plaintiff admits that he routinely washed his vest in his home washing machine every few days without special treatment.

With respect to the fourth subparagraph of the exception, Plaintiff alleges that the wash and wear exception requires a number of uniforms equal to the number of days worked.  *See* SAC, ¶ 59.)  Plaintiff, however, espouses an overly broad interpretation of the HIWO, which is at odds with the plain language of the wage order.  When drafting the HIWO, the NYSDOL used the word "equals" in reference to tip credits in § 146-1.3, but used the words "sufficient" and "consistent with" in reference to the wash and wear exception in § 146-1.7.   The canons of construction dictate that when a drafter uses a specific word in one section and a different word in another, it is presumed that the word choice was intentional.  *U.S. v. Peterson*, 394 F.3d 98, 107 (2d Cir. 2005).  Accordingly, in his Report-Recommendation and Order on this precise issue in another case, Magistrate Judge Baxter rejected the interpretation of the wash and wear exception adopted by Plaintiff in this case, stating:

> Given that the authors of the Hospitality Wage Order, if they so intended, could have drafted a bright-line standard such as that

18

> suggested by the plaintiffs, the court concludes that it must apply
> the more subjective language of § 146-1.7(b)(4), as written.

*Gregory v. Stewart's Shops Corp.*, No. 7:14-cv-33(TJM/ATB), 2016 U.S. Dist. LEXIS 89576, (July 8, 2016, N.D.N.Y.). The Wage Order simply does not require Walmart to furnish employees with a number of uniforms equal to their average days worked.

Here, Plaintiff's testimony establishes that he received a "sufficient number of uniforms, consistent with the average number of days per week worked." Pursuant to Walmart's Dress Code Policy, Plaintiff was initially issued two vests. Biasi Dep. at 171:16-17, Biasi Dep. Ex. 9 (WAL-000419). When he needed another vest, however, Walmart provided one. Biasi Dep. at 91:25-92:5; *see* Dunphy Dec. at ¶ 13. With respect to his laundry habits, Plaintiff testified that he routinely laundered his personal garments and that he merely threw his vests in with his other laundry. Biasi Dep. at 175:23-176:1. Notably, Plaintiff testified that he "never had a reason" to complain about washing his vest at home. *Id.* at 175:17-20.

Accordingly, assuming that the HIWO even applies to Plaintiff, Walmart is entitled to summary judgment on any claim for uniform maintenance pay because it provided all employees, including Plaintiff, with a sufficient supply of wash-and-wear vests.

## POINT V

## PLAINTIFF'S PROPOSED AMENDED COMPLAINT DOES NOT SAVE THE SECOND CAUSE OF ACTION FROM SUMMARY JUDGMENT[9]

Recognizing some of the obvious weaknesses in his own claim under the HIWO, Plaintiff seeks to amend the SAC to add Cynthia Mecca as a proposed plaintiff/class representative. *See* Plaintiff's unfiled Third Amended Complaint, a copy of which is attached as Exhibit F to the

---

[9] Although Plaintiff has not filed a motion to amend, this argument is included pursuant to Magistrate Judge Baxter's instruction that Walmart's motion "shall anticipate plaintiff's proposed amended complaint."

Asaad Dec.  This proposed addition, however, would not save Plaintiff's claim from summary judgment if the Court agrees with any of Walmart's arguments above.

If the Court were to agree with Walmart's arguments in Point II (that the HIWO does not apply to the deli in the Amsterdam Walmart) or Point IV (that the wash and wear exception precludes a claim for uniform maintenance pay), the proposed amendment would be futile.  If the Court were to disagree with Walmart's arguments in Points II and IV but agree with Point III (that Plaintiff himself was not covered by the HIWO), joinder of Plaintiff's remaining cause of action with Ms. Mecca's proposed cause of action would be improper under Rule 20 of the Federal Rules of Civil Procedure.

Under Rule 20, "persons may join in one action as plaintiffs" only if their claims "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a)(2). If Mr. Biasi's second cause of action is dismissed, his only remaining claim is an individual discrimination/harassment claim allegedly arising out of his own interactions with his supervisor, Defendant Earlene Schaffer. The proposed amended complaint asserts claims for uniform maintenance pay on behalf of deli associates who have nothing to do with Mr. Biasi or his claims against Ms. Schaffer.  Such a claim would constitute a completely separate action arising out of different transactions or occurrences.  Amendment of the SAC would be inappropriate under these circumstances and does nothing to change the fact that Walmart is entitled to judgment in its favor on the Second Cause of Action of the SAC.

## CONCLUSION

For the foregoing reasons, Walmart respectfully requests that the Court grant its Motion

for Summary Judgment on the Second Cause of Action of Plaintiff's SAC.


Dated:  Hartford, Connecticut
          August 15, 2016

Respectfully submitted,

McCarter & English, LLP

*Attorneys for Defendants*
*Wal-Mart Stores, Inc., Earlene Schaeffer,*
*Ryan Dunphy, and Rebecca Paukstela*

By:   */s/ Pamela J. Moore*
     Pamela J. Moore (Bar Roll # 106636)
     Sami Asaad (Bar Roll # 519386)
     CityPlace I
     185 Asylum Street
     Hartford, Connecticut 06103
     Tel.:  (860) 275-6700
     Fax:  (860) 724-3397
     pmoore@mccarter.com
     sasaad@mccarter.com


## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was filed electronically this 15th day of

August, 2016.  Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.


By: *ted/s/ Pamela J. Moore*
    Pamela J. Moore

ME1 23035576v.3